United States District Court
District Of Maine

| | | |
|---|---|---|
| Eric L. Thomas, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. |
| | ) | |
| Pan Am Railways, Inc. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Springfield Terminal Railway Company, | ) | |
| | ) | |
| Defendants. | ) | |

**Complaint and Demand For Jury Trial
and Injunctive Relief Sought**

Eric L. Thomas complains against Pan Am Railways, Inc. (Pan Am)

and Springfield Terminal Railway Company (ST) as follows:

**Summary of Civil Rights Action for Illegal Disability Discrimination
Because of Need For Temporary Cancer Treatment**

1.      Eric Thomas earned good performance reviews and merited a

promotion to Assistant Manager within three months after beginning to

work for Pan Am. After his promotion, he continued to perform all of his job

duties well and had no discipline or negative performance issues. But then,

when he got cancer and requested the reasonable accommodation of a three-

week extension of his medical leave to complete his chemoradiation and recovery, Pan Am terminated him from his Assistant Manager position that same day. Pan Am's only excuse for this termination was that having this vacancy for another three weeks would allegedly be a "hardship." This Assistant Manager job, however, remained open for another six weeks, including four weeks after Pan Am received a note from Thomas's doctor releasing him to return to work without restrictions. Pan Am refused Thomas's repeated requests to be reinstated, even though the position remained open. The Maine Human Rights Commission investigated and found that Pan Am engaged in illegal disability discrimination and retaliation when it denied this request for reasonable accommodation and, instead, terminated Thomas and denied his requests for reinstatement.

## Parties

2.     Plaintiff, Eric L. Thomas, is a citizen of the United States and is a resident of Winslow, Kennebec County, Maine.

3.     Defendant Pan Am Railways, Inc., is a corporation organized under the laws of the State of Delaware and providing railroad freight services throughout the northeastern United States and Atlantic Canada.

4.     Pan Am owns and operates the Springfield Terminal Railway Company, including a location in Waterville, Maine where Mr. Thomas worked.

5.     Defendant Pan Am had over 1000 employees for more than 20 weeks in the years 2012 and 2013.

6.      Defendant ST had over 800 employees for more than 20 weeks in the years 2012 and 2013.

7.     Both Defendants received federal financial assistance from the United States during Mr. Thomas's employment.

## Jury Trial Demand

8.     Under Fed. R. Civ. P. 38(b), Plaintiff demands trial by jury on all issues triable to a jury.

## Jurisdiction and Venue

9.     This action arises under the Rehabilitation Act of 1973, as amended, 29 U.S.C.A. § 794, the Americans with Disabilities Act, as amended, 42 U.S.C §§ 12101 *et seq.*, and the Maine Human Rights Act, 5 M.R.S. §§ 4551 *et seq.* This Court has proper subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1341 (federal question) and 1343 (civil rights) and supplemental jurisdiction over the state-based MHRA claims.

10.   Venue is proper in the District of Maine under 28 U.S.C. § 1391(a). Under Rule 3(b) of the Rules of this Court, this action is properly filed in Bangor because this case arises in Kennebec County where Plaintiff was employed by Defendants.

## Administrative Procedure

11.   On July 9, 2014, Mr. Thomas filed a complaint of disability discrimination and retaliation in employment against Pan Am with the Maine Human Rights Commission (MHRC) and Equal Employment Opportunity Commission (EEOC).

12.   In a detailed report dated June 15, 2015, an Investigator for the MHRC determined that accommodations requested by Thomas for his cancer were  reasonable and not an undue burden on Pan Am, with reasoning including the following:

13.   "[T]erminating Complainant from the position as of 9/15/2013 makes no sense when considering the evidence that the position actually did remain vacant for the three extra weeks Complainant would have been out on extended leave, as well as the two weeks during which Complainant would have been on "limited" duty (eight-hour days rather than 12)."

14.   "If time truly was of the essence in filling the position, due to alleged operational and/or financial considerations, Complainant – who was

ready, willing, and able to return to his former position in early October –

was clearly the logical candidate."

15.    "Complainant has also asserted that at no time while he was out

on medical leave did any manager ever express that covering his position

while he was out posed an undue hardship. Rather, Complainant asserts

that the Superintendent reassured him that the company had "extra"

managers who could cover his position while he was out. Respondent has not

refuted this assertion despite being provided with the opportunity to do so."

16.    "Lastly, while Respondent has also attempted to justify its

termination decision by suggesting that Complainant was requesting

indefinite leave on 9/13/2013, its own documentation confirms that the

requested accommodations was precise and finite – three weeks more of

additional leave (with no work), and then two more weeks of a return to

work at reduced shifts, before returning to full duty, without work

restrictions."

17.    The Investigator's Report recommended that the Commission

find that:

(a)    There are REASONABLE GROUNDS to believe that

Complainant Eric Thomas was subjected to unlawful disability

discrimination by Respondent Pan Am Railways, Inc. when it refused his

request for reasonable accommodations in employment;

(b)     There are REASONABLE GROUNDS to believe that Complainant Eric Thomas was subjected to unlawful disability discrimination when Respondent Pan Am Railways, Inc. terminated his employment; [and]

(c)     There are REASONABLE GROUNDS to believe that Respondent\Pan Am Railways, Inc. subjected Complainant Eric Thomas to unlawful retaliation for exercising rights under the MHRA.

18.   A copy of the Investigator's Report is attached as Exhibit 1.

19.   Pan Am waived its right to file any objections to the Investigator's Report.

20.   By letter dated July 15, 2015, the MHRC issued its Statement of Finding, relying on the Investigator's Report, that there are reasonable grounds to believe that unlawful discrimination has occurred.

21.   By letter dated August 11, 2015, the Maine Human Rights Commission issued a Notice of Failed Conciliation, due to Pan Am's refusal to engage in the conciliation process.

22.   Under 5 M.R.S. § 4622, Mr. Thomas has satisfied one or more of the prerequisites to be awarded attorney fees and all available damages under the Maine Human Rights Act.

23.   Mr. Thomas has exhausted his administrative remedies for all claims in this action that require administrative exhaustion.

## Facts

24.     On July 5, 2012, Mr. Thomas began working as a Machinist for Pan Am and ST. Pan Am and ST jointly employed Mr. Thomas and they both controlled the terms of his employment.

25.     Mr. Thomas worked at Defendants' Waterville, Maine location.

26.     Mr. Thomas became a member of the International Association of Machinists and Aerospace workers union, Local 409.

27.     All of Mr. Thomas's "new employee" reviews were good.

28.     Pan Am and ST promoted Mr. Thomas to an Assistant Manager position within the Engine House of the Mechanical Department.

29.     Mr. Thomas began working as an Assistant Manager on October 5, 2012.

30.     Mr. Thomas performed the duties of his job as an Assistant Manager well.

31.     While working as an Assistant Manager, Mr. Thomas was diagnosed with tonsillar cancer.

32.     Mr. Thomas's tonsillar cancer substantially limited one or more of his major life activities, including but not limited to his ability to speak, to eat and to work; the cancer also significantly impaired his physical health.

33.    Mr. Thomas's cancer is a "disability" *per se* under the Maine Human Rights Act, 5 M.R.S. § 4553-A(1)(B).

34.    Pan Am and ST knew about Mr. Thomas's disability.

35.    On about May 25, 2013, Mr. Thomas began a medical leave of absence to undergo treatment for his cancer.

36.    By a letter dated June 10, 2013, Pan Am and ST officially approved Mr. Thomas's medical leave of absence from May 25, 2013 until September 16, 2013.

37.    Pan Am and ST based their determination of the length of Mr. Thomas's approved leave of absence on Mr. Thomas's doctor's best projections at that time, which was in or around early June 2013.

38.    Throughout the course of his leave, Mr. Thomas proactively updated Pan Am about his condition and anticipated return to work date.

39.    On September 13, 2013, Mr. Thomas contacted Pan Am, and explained to Superintendent William Mayo and Assistant Superintendent Mark Gray, in person, that his doctor advised he needed additional accommodation in order to transition successfully back to work after months of chemoradiation treatment.

40.    Mr. Thomas requested the accommodation of three more weeks' leave and then that he return to work with a temporarily restricted scheduled for another two weeks.

41.     Mr. Thomas informed Pan Am that his oncologist recommended that he limit his return to work to 8-hour shifts initially and then after two weeks he could resume his regular 12-hour shifts.

42.     Mr. Thomas was able to perform the essential functions of his job with the reasonable accommodation of a finite amount of additional temporary leave.

43.     Mr. Thomas's request for accommodation was sufficiently direct and specific so as to put Pan Am and ST on notice of his need for an accommodation.

44.     Mr. Thomas held a good faith and objectively reasonably belief that his request for an accommodation had merit.

45.     Mr. Thomas also told Mr. Mayo and Mr. Gray that Mr. Thomas's doctor had said that he would have no problem with releasing Mr. Thomas to full duty once he determined that Mr. Thomas was able to return to work.

46.     Mr. Mayo and Mr. Gray's response to Mr. Thomas's request for accommodation was that they were glad he would be back.

47.     Mr. Mayo and Mr. Gray instructed Mr. Thomas to go home and told him they would make some phone calls and then call him later that day.

48.     On September 13, 2013, Mr. Mayo forwarded Mr. Thomas's request for accommodation to Pan Am's Vice President of the Mechanical Department, James Olson, and also to Pan Am's Human Resources

Department, including Ms. Bourassa, Pan Am's Director of Personnel Administration.

49.    On that same day, September 13, 2013, Ms. Bourassa approved the termination of Mr. Thomas's employment with Pan Am, effective September 15, 2013.

50.    By a letter dated September 13, 2013, Pan Am terminated Mr. Thomas's employment, claiming that it could not hold open his Assistant Manager position any longer as "its vacancy is a hardship for the Mechanical Department."

51.    In terminating Mr. Thomas's employment that same day Mr. Thomas requested an accommodation, Pan Am and ST denied Mr. Thomas's requested accommodation.

52.    Pan Am never contacted Mr. Thomas during his medical leave between May 25, 2013 and September 13, 2013 to suggest that his absence caused Pan Am any hardship or that he was in jeopardy of losing his job if he could not return on September 16, 2013.

53.    Mr. Mayo had informed Mr. Thomas that there were plenty of "extra" managers available to fill in for him while he was out on medical leave.

54.    Pam Am and ST denied Mr. Thomas's requested accommodation even though it would not cause Pan Am or ST undue hardship.

55. Pan Am's articulated reason for the termination of Mr. Thomas's employment is untrue.

56. Neither Mr. Mayo nor Mr. Gray contacted Mr. Thomas on September 13, 2013, after he met with them to request an accommodation, as they said they would.

57. When Mr. Thomas did not receive a follow-up call from either Mr. Mayo or Mr. Gray on September 13, 2013 regarding his meeting with them about his request for accommodation, he attempted to contact them the following day.

58. On September 14, 2013, Mr. Thomas attempted to contact Mr. Mayo, whom he could not reach, and then he contacted Mr. Gray. Mr. Gray advised Mr. Thomas to contact Mr. Olson.

59. Mr. Thomas contacted Mr. Olson on about September 14, 2013, and Mr. Olson told him that the Company could no longer carry him and so it would be terminating his position as Assistant Manager.

60. Mr. Thomas then asked Mr. Olson if he could have his Assistant Manager position back if it was still open at the time he was able to return to work. Mr. Olson told him "absolutely, I don't see any problem with that."

61. Pan Am and ST terminated Mr. Thomas's employment as Assistant Manager rather than provide Mr. Thomas with three more weeks of leave as an accommodation for his disability.

62.    Pan Am and ST terminated Mr. Thomas's employment as Assistant Manager even though there was a continuing need for the work to be performed.

63.    On October 3, 2013 – less than 3 weeks after Pan Am terminated Mr. Thomas's employment – Mr. Thomas was cleared by his doctor to return to work full time, without any restrictions.

64.    On October 3, 2013, Mr. Thomas went, in person, to Pan Am's place of business to deliver notice of his medical release, by hand, and Pan Am acknowledged receipt of that notice that day.

65.    On October 3, 2013, Pan Am and ST knew that Mr. Thomas was medically released to return to work without any medical restrictions.

66.    On October 3, 2013, Mr. Thomas's Assistant Manager position was still vacant.

67.    On October 18, 2013, Mr. Thomas contacted Mr. Gray in person about his Assistant Manager's position. Mr. Thomas told Mr. Gray that he understood his Assistant Manager position was still open and that Mr. Olson had told him he could have his job back if it was not filled by the time he was able to return to work.

68.    Mr. Gray responded that he was not sure about it and deferred to Mr. Mayo.

69.    Later on October 18, 2013, Mr. Thomas contacted Mr. Mayo in person about his Assistant Manager's position. Mr. Thomas told Mr. Mayo that he understood his Assistant Manager position was still open and that, when he spoke with Mr. Olson a few weeks prior, Mr. Olson had told him he could have his job back if it was still open when he returned to work. Mr. Thomas told Mr. Mayo that if the position was still open, he wanted it back.

70.    Mr. Mayo responded that he did not know about the status of the job. Mr. Mayo added that he was not going to bat for Mr. Thomas and that ultimately it was a personnel department decision. Mr. Mayo suggested that personnel had already made up its mind that Mr. Thomas would not get his job as Assistant Manager back.

71.    After investigation, the MHRC found that: Respondent [Pan Am] has offered little if any evidence that, after having covered Complainant's [Mr. Thomas] Assistant Manager position for the four months while he was on medical leave, it would have been an undue hardship to continue to do so for the relatively short additional three weeks he requested, or by granting his other requested reasonable accommodation of allowing him to work a slightly reduced work shift for the first two weeks after his return to work…. [T]erminating Complainant from the position as of 9/15/2013 makes no sense when considering the evidence that the position actually did remain vacant for the three extra weeks Complainant would have been out on extended

leave, as well as the two weeks during which Complainant would have been on "limited" duty (eight-hour days rather than 12). *See* Exhibit 1, at 7.

72.   After investigation, the MHRC found that Pan Am's "own documentation confirms that the requested accommodations was [sic] precise and finite." *See* Exhibit 1, at 7.

73.   After investigation, the MHRC found that: Complainant established that he would not have been terminated from his Assistant Manager position but for his disability. The only reason Complainant was unavailable for his work was because of his disability, which required him to take medical leave for treatment. Complainant had identified his return to work date, and limited restrictions that would last only a few weeks. Respondent's refusal to grant those accommodations was not reasonable. *See* Exhibit 1, at 8.

74.   After investigation, the MHRC found that: Respondent clearly took [Mr. Thomas's] prior [approved] leave time into account when it considered whether to grant Complainant's additional requests for accommodation in September. The fact that Complainant's employment was in fact terminated the same day that he requested additional accommodations provides strong evidence that this request was almost certainly a motivating factor in that decision. *See* Exhibit 1, at 9.

75.   Pan Am and ST never returned Mr. Thomas to his former Assistant Manager position or any other Assistant Manager position.

76.   Pan Am and ST failed to act in good faith and failed to engage in the interactive process of determining whether the requested accommodation was reasonable under the circumstances.

77.   Pan Am and ST failed to provide Mr. Thomas with the accommodation of additional temporary medical leave.

78.   Pan Am and ST failed to provide Mr. Thomas with the accommodation of a part-time or modified work schedule for two weeks.

79.   Mr. Thomas could have performed the essential functions of his job with the proposed accommodation of additional temporary and finite leave.

80.   Mr. Thomas's proposed accommodations were feasible for Pan Am and ST under the circumstances.

81.   Pan Am and ST failed to reasonably accommodate Mr. Thomas.

82.   Pan Am and ST failed to reasonably reconsider the September 13, 2013 decision to terminate Mr. Thomas's employment when Mr. Thomas presented Pan Am a medical release on October 3, 2013 allowing him to return to work unrestricted, given that Mr. Thomas's former Assistant Manager position was still vacant.

83.    Defendants acted with actual malice and reckless disregard for

Mr. Thomas's rights protected under the Maine Human Rights Act, the

Rehabilitation Act of 1973, and the Americans with Disabilities Act.

## Legal Claim

### (Disability Discrimination, Denial of Reasonable Accommodations, and Retaliation)

84.    The allegations in paragraphs 1-83 are realleged.

85.    Defendants have intentionally discriminated against Eric

Thomas because of his disability, denied him reasonable accommodations for

his disability, and retaliated and discriminated against him for requesting

reasonable accommodations for his disability, in violation of section 504 of

the Rehabilitation Act of 1973, as amended, 29 U.S.C.A. § 794, the

Americans with Disabilities Act, 42 U.S.C §§ 12101 *et seq.*, and the Maine

Human Rights Act, 5 M.R.S. §§ 4551-4634.

86.    Eric Thomas is pursuing all possible methods of proving this

discrimination and retaliation, including but not limited to, circumstantial

and direct evidence, pretext evidence, as well as causation based on a single

unlawful motive and mixed motives, including an unlawful motive.

87.    As a direct and proximate result of Defendants' intentional

discrimination and retaliation against Plaintiff, Plaintiff has suffered and

will continue to suffer damages, including, but not limited to, back pay and

benefits, loss of self-confidence and self-respect, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of his job and of his life, injury to reputation, and other pecuniary and non-pecuniary losses. Wherefore, Plaintiff requests relief against Defendants as follows:

(d)     Enter declaratory relief that Defendants violated Plaintiff's statutory civil rights to be free of disability discrimination and unlawful retaliation;

(e)     Enter injunctive relief ordering Defendants to:

- provide effective civil rights training for all Human Resource employees and all supervisors on the requirements of all applicable laws prohibiting employment discrimination because of disability and complete this training within 60 days of the entry of Judgment for Injunctive Relief;

- provide this training for two years after the date judgment is entered to all new HR  and supervisory employees within 60 days of their starting the position;

- maintain attendance sheets identifying each person who attended each training session and forward a copy of the attendance sheets to Plaintiff's counsel within seven days of each training session;

- post at each of its worksites a copy of a remedial notice detailing the judgment in this case as well as the order providing injunctive relief;

- send a letter printed on Defendants' letterhead and signed by the Defendants' Chief Executive Officers to all of Defendants' employees advising them of the judgment in this case, enclosing a copy of their policies regarding reasonable accommodations and prohibiting disability discrimination, and stating that they will not tolerate any such discrimination or denial of reasonable accommodations, and will take appropriate disciplinary action against any employee or agent of Defendants who engage in such discrimination;

(f)    Award Plaintiff back pay for lost wages and benefits and prejudgment interest thereon and reinstatement to his Assistant Manager position, or, in lieu thereof, front pay for future lost wages and benefits;

(g)    Award compensatory damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

(h)    Award punitive damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

(i)    Award Plaintiff  full costs and reasonable attorney's fees; and

(j)    Award such further relief as is deemed appropriate.

Date:    November 9, 2015                    Respectfully submitted,


/s/ David G. Webbert
David G. Webbert
Johnson, Webbert & Young, L.L.P.
160 Capital Street, P.O. Box 79
Augusta, Maine 04332-0079
(207) 623-5110
dwebbert@johnsonwebbert.com


/s/ Allison G. Gray
Allison G. Gray
Johnson, Webbert & Young, L.L.P.
160 Capital Street, P.O. Box 79
Augusta, Maine 04332-0079
(207) 623-5110
agray@johnsonwebbert.com

*Attorneys for Plaintiff*